CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
1/27/2025
LAURA A. AUSTIN, CLERK
BY: s/ CARMEN AMOS
     DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRENDON COLE WEBBER,<br><br>*Defendant.* | CASE NO. 6:24-cr-00019<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Defendant Brendon Cole Webber moves to suppress evidence seized and statements made during a police encounter, arguing that his Fourth Amendment rights were violated. Mot. Suppress (Dkt. 36); Mem. Supp. Def.'s Mot. Suppress (Dkt. 37). For the reasons set forth below, the Defendant's Motion to Suppress will be DENIED in an Order to follow.

I.  **BACKGROUND**

A. **Procedural Background**

The Grand Jury indicted Defendant on one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(8). At oral argument on Defendant's Motion to Suppress, the Court heard the testimony of Lynchburg Sheriff's Office Sgt. Shad Hudson and Lynchburg Police Department Officer Tereika Grooms. The Court has also considered Sgt. Hudson's Use of Authority Report (Dkt. 40-2) and sworn statement (Dkt. 40-1), Deputy Darys King's Use of Authority Report (Dkt. 40-3), Officer Grooms' Incident Report (Dkt. 40-5) and body camera footage (Dkt. 40-4), the Grand Jury testimony transcript of witness Dorothy Davis (Dkt. 43-1), and Officer Keelan Wallace's body camera footage (Dkt. 40-

1

7).

### B. Factual Background

The Court finds Sgt. Hudson's testimony to be credible. According to Hudson, he and Deputy King had completed an inmate transport assignment when a woman, waving her arms frantically, approached them at the intersection of Federal Street and 7th Street at approximately 3:48 p.m. on May 5, 2022. Hr'g Tr. 6:19-22-7:11; Dkt. 40-1 ¶ 2(a). The woman stated that a man had fallen out of a car and had begun shooting at it as it drove away. Hr'g Tr. 7:24, 8:15-16; 28:20-25. She described the car as white, then corrected herself and stated that the car was black. *Id.* 9:14-15. She said that the man ran toward the Family Dollar store; then she drove away. *Id.* 8:24; 27:12-13. Hudson testified that the woman was very frightened and "visibly and audibly disturbed" by what she had witnessed. Hr'g Tr. 27:8-13. Hudson found her reliable and credible based on his personal interactions with and observations of her, and he understood her to be reporting a shooting that occurred seconds earlier approximately one block away. Hr'g Tr. 27:5-13; Dkt. 40-1 ¶ 2(a). Hudson phoned the Lynchburg Department of Emergency Services ("LynCom"), confirmed that no reports of shots fired had been made, and relayed the information the woman had given him. Hr'g Tr. 10:9-14; Dkt. 40-1 ¶ 2(b).

Deputies Hudson and King arrived at the Family Dollar store less than one minute after encountering the woman, drove through the parking lot and exited onto Fourth Street where they encountered a silver Chevrolet Impala stopped on the right side of the road in a no-parking zone, but away from the curb. Hr'g Tr. 28:8-10, 14-16; 30:14-16. Hudson observed an older black female driver, later identified as Dorothy Davis, and a black male passenger, Ms. Davis' adult son, inside the Impala; the driver's side rear door was open and a man, later identified as the

Defendant, was attempting to enter the vehicle. *Id.* 32:15-25. The front seat occupants looked surprised, distressed, and frightened by the man entering the back seat of the car. *Id.* 33:14-20. Based on the facial reactions of the front seat passengers, Hudson believed that the Defendant had not been invited into the vehicle. *Id.* 36:10-11; Dkt. 401- ¶ 2(b)(x). Given the witness tip, the fact that the Defendant was on foot where the woman had indicated the shooter ran, the fact that the car was stopped in a no-parking zone, and the reaction of the front two passengers to the Defendant, Hudson believed that criminal activity was either in progress or about to occur. Dkt. 40-1 ¶ 2(c)(i).

    Hudson activated the emergency lights, parked, and exited his vehicle in order to see the front license plate. Hr'g Tr. 34:1-9; 35:9-10. After the lights were activated, the front passenger raised his hands, and Ms. Davis put both of her hands on the steering wheel; Hudson removed his handgun and held it at his side as he called in the license plate number. *Id.* 18:25-19:21. Hudson instructed the occupants to show their hands as the Defendant entered the vehicle and closed the door; the front passengers readily complied with commands but the Defendant "seemed to be fumbling and was ducked down a little in the rear seat." *Id.* 19:5-6; Dkt. 40-1 ¶2(c); Dkt. 40-2 at 3. Hudson kept yelling at the Defendant to show his hands. Hr'g Tr. 19:9-15. According to Hudson, it was obvious that the front two passengers were uncomfortable with the Defendant and were very frightened of the situation. *Id.* 42:20-24.

    King then exited the transport vehicle and instructed Ms. Davis to roll down the windows, which she did. *Id.* 20:1-3. With the windows down, Hudson was able to observe the Defendant sweating profusely, with visible mucus coming out of his nose. *Id.* 37:14-16. The front seat passengers appeared to be telling the Defendant to comply with Hudson's commands.

*Id.* 37:24-38:6. Hudson suspected that the Defendant was likely involved in the incident described earlier by the woman who had flagged him down and that the Defendant had involved the other passengers unwillingly. Dkt. 40-1 ¶2(c). As Hudson moved toward the rear door, he raised his weapon and pointed it at the Defendant, yelling for him to show his hands. Hr'g Tr. 38:1-8. The Defendant eventually raised his hands in compliance. *Id.* 38:9-10. Hudson estimates that he instructed the Defendant more than five times to show his hands. *Id.* 38:7-8. King's description of events is consistent with Hudson's. Dkt. 40-3.

Lynchburg Police Officers Grooms and Smith arrived on scene approximately three minutes later and took charge of the situation. Dkt. 40-1 ¶ 2(d). Grooms ordered the Defendant out of the vehicle, placed him in handcuffs and seated him in the rear of her police cruiser as she called for a medic. *Id.*; Hr'g Tr. 1-12; Dkt. 40-7 15:56:08-15:57:30.

Officer Grooms' body camera footage recorded Defendant sitting in the back of her cruiser, stating, "there is a gun in the back seat." Hr'g Tr. 48:6-9; Dkt. 40-4 15:59:26-16:00:40. Defendant indicated to Grooms that he was injured, and at approximately 4:02 p.m. paramedics arrived on scene and administered aid to Defendant. Hr'g Tr. 50:11-12; Dkt. 40-7 16:02:45-16:03:40. Defendant was placed on a stretcher and taken to the hospital at approximately 4:10 p.m. *Id.;* Dkt. 40-7 16:09:30-16:11:00. The entire incident, from the report of the female witness to Defendant's departure from the scene lasted approximately twenty-two minutes.

Grooms proceeded to interview Ms. Davis and her son who confirmed that they did not know Defendant. Dkt. 40-4 6:06-16:10:30; 16:11:55-16:14. Ms. Davis testified that she observed Defendant fall from a car, dropping his wallet. *Id.*; Dkt. 43-1 5:18-21. She described hearing shots coming from the vehicle. Dkt. 43-1 5:19-20. The Defendant started running. *Id.* 5:5. Davis'

4

son got out of the car, retrieved the wallet, and attempted to return it to the Defendant; Defendant asked them for a ride and attempted to enter the car. *Id.* 6:6-8. Ms. Davis told Grooms that she was the owner of the vehicle, and she consented to its search. Dkt. 40-4 16:15:50-16:16:20. Officer Grooms found a loaded firearm on the rear passenger floor mat with four bullets in the magazine and one in the chamber as well as a small clear baggy containing a crystal-like substance. Dkt. 40-5 5. The gun did not belong to Ms. Davis or her son. Dkt. 43-1 10:9-10:4.

## II. DISCUSSION

### A. The Seizure of the Firearm was Lawful.

1. Defendant Lacked a Reasonable Expectation of Privacy in the Vehicle; Therefore, he does not have Standing to Challenge its Search.

The Fourth Amendment protects individuals from unreasonable, warrantless searches and seizures. *See, e.g.*, *Byrd v. United States*, 584 U.S. 395 (2028). However, a defendant must have a "reasonable expectation of privacy" in the place searched in order to challenge a search on Fourth Amendment grounds. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Rusher*, 966 F.2d 868, 873-74 (4th Cir. 1992). The Defendant bears the burden of proving that he had a reasonable expectation of privacy in the area searched. *Rakas*, 439 U.S. at 143.

Passengers who claim no property or possessory interest in a vehicle do not have a legitimate expectation of privacy in the vehicle. *See Rakas*, 439 U.S. at 148-49; *U.S. v. Smith*, 21 F.4th 122, 130 (4th Cir. 2021); Here, Defendant lacked a property or possessory interest in the vehicle and therefore cannot demonstrate the reasonable expectation of privacy required to challenge the search of the vehicle and suppress the evidence obtained.

2. Defendant was Lawfully Seized during a Terry Stop; Therefore, the Firearm and Statements made were not Fruits of an Illegal Search.

5

A passenger who has been seized in a traffic stop may challenge the legality of the stop and the search that is the fruit of an illegal seizure. *Rakas*, 439 U.S. at 148-149, *Brendlin v. California*, 551 U.S. 249, 258 (2007); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). Here, Defendant was seized when, after Hudson moved toward the rear door, raised his weapon, and yelled approximately five times for Defendant to raise his hands, Defendant submitted. However, Defendant was not illegally seized. Rather, Defendant was subject to a lawful Terry stop and search.

An officer may stop and detain a person for investigative purposes (known as an investigative or *Terry* stop) when there is "reasonable suspicion" based on articulable facts, that criminal activity is afoot. *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000); *United States v. Sokolow,* 490 U.S. 1, 7 (1989); *Terry v. Ohio,* 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. *See, e.g. United States v. Arvizu,* 534 U.S. 266 (2002); *United States v. Coleman*, 18 F.4th 131, 136 (4th Cir. 2021). The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition … [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993); *United States v. Johnson,* 599 F.3d 339, 343–45 (4th Cir.), cert. denied, 562 U.S. 941 (2010). Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. *See, e.g.*, *United States v. Gutierrez,* 963 F.3d 320, 334–36 (4th Cir.), cert. denied 141 S. Ct. 419 (2020) (reasonable suspicion to stop only vehicle leaving neighborhood about 20 minutes after 4:00 a.m.

home invasion was reported).

During a Terry stop, officers are authorized to "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *U.S. v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). Such actions may include drawing weapons, handcuffing suspects, placing a suspect in a patrol car for questioning, or using or threatening to use force. *Id.* at 1109-1110.

Here, the officers had reasonable suspicion supported by articulable facts that criminal activity was afoot and therefore legally executed a Terry stop. First, the officers acted on a witness tip. Information received from an anonymous source can establish reasonable suspicion when it includes "sufficient indicia of reliability." *United States v. Elston,* 479 F.3d 314, 318 (4th Cir.), cert. denied, 550 U.S. 927 (2007). "Face-to-face" tips are afforded additional credibility and are deemed "more trustworthy and reliable than [tips from anonymous sources]." *United States v. Lawing,* 703 F.3d 229, 237 (4th Cir. 2012), cert. denied, 569 U.S. 940 (2013), quoting *United States v. Christmas,* 222 F.3d 141, 144 (4th Cir. 2000), cert. denied, 531 U.S. 1098 (2001). In a face-to-face encounter, officers can judge the credibility of the tipster firsthand and establish whether the tip is sufficiently reliable to support reasonable suspicion. *Williams*, 407 U.S. at 146-47. Here, the officers received a face-to-face tip that a shooting had occurred and were able to assess the credibility of the witness who, according to Hudson, seemed frightened by what she had witnessed. Hudson believed her to be credible.

Additional articulable facts contributed to the officers' reasonable suspicion. When arriving on scene, Hudson observed the front seat passengers' faces. Hudson stated that "the front two passengers looked very surprised, distressed, and frightened by the man entering the

7

back seat of the car." Dkt. 40-1 at ¶ 2(b)(x). Based on the facial reactions of the front seat passengers, Hudson reasonably believed that the Defendant was an uninvited occupant of the car and that the front seat passengers were frightened. *Id.* Hudson averred that "Given the face-to-face tip from what I reasonably believed to be a reliable citizen, the fact that Webber was on-foot where the witness said the shooter had ran on-foot, the fact the car was parked in a no-parking zone, and the reaction that the front two passengers had to the man in the back of the car, I reasonably believed that criminal activity was or was about to be in progress." *Id.* at ¶ 2(c)(i). Additionally, the Defendant fumbled and ducked, and initially refused to show his hands, despite numerous requests. *Id.* at ¶ 2(c)(vi). Once the vehicle's windows were down, Hudson observed the Defendant sweating profusely, breathing heavily, with visible mucus coming out of his nose. *Id.* at ¶ 2(c)(viii). Given these articulable facts, the Officers had reasonable suspicion to conduct a Terry stop. Further, the Officers acted reasonably in securing the scene and protecting themselves and the public by drawing a weapon, handcuffing Defendant, and placing him in a patrol car for questioning.

Because the officers conducted a lawful Terry stop, the search of the vehicle and seizure of the firearm were lawful and did not infringe on the Defendant's constitutional rights. Accordingly, the firearm and any statements made incident to the lawful Terry stop are not the fruits of an illegal seizure and will not be suppressed.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress will be DENIED in an order to follow.

The Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to

all counsel of record.

    Entered this 27th day of January, 2025.

                                             NORMAN K. MOON
                                             SENIOR UNITED STATES DISTRICT JUDGE